# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JOSHUA WELLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 17 C 6301 |
| | ) | |
| PARAMEDIC SERVICES OF ILLINOIS, | ) | |
| INC., a corporation, VILLAGE OF | ) | |
| LINCOLNWOOD, a municipal corporation, | ) | |
| and JANE AND JOHN DOES #1-10, | ) | |
| individuals, organizations, corporations, or | ) | |
| other legal entities whose names are | ) | |
| presently unknown, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

Before the Court are a pair of motions seeking dismissal of portions of Plaintiff Joshua Weller's ("Weller") Amended Complaint, brought by Defendants Paramedic Services of Illinois, Inc. ("PSI") and the Village of Lincolnwood ("Village"), pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the Court grants the Village's request to dismiss Count VIII, but we order the dismissal to proceed without prejudice. We deny PSI's motion as to Counts I, II, III, IV, VI, and VII. We grant PSI's motion to dismiss Count IX, without prejudice, as well as Weller's request to amend his complaint in keeping with Count IX's dismissal. It is so ordered.

## FACTUAL BACKGROUND

The following facts are taken from Weller's Amended Complaint and are assumed to be true for purposes of these motions. *Murphy v. Walker,* 51 F.3d 714, 717 (7th Cir. 1995). The Court draws all reasonable inferences in Weller's favor. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

On or around October 28, 2010, Weller began working for PSI as a firefighter/paramedic, where he would go on to receive regular raises and positive performance reviews for the next six years. PSI, an Illinois company headquartered in Schiller Park, provides contractual paramedic and fire services, primarily to municipal and fire protection districts. On or around December 8, 2015, PSI transferred Weller to the Lincolnwood Fire Department ("LFD").

### a. Harassment of Weller & Firefighter/Paramedic Chloe Martinez

After learning he was to be transferred to LFD, but before he began working there, Weller was allegedly told by Lieutenant Bryan Graham ("Graham") that firefighter/paramedic Chloe Martinez ("Martinez") was a "massive bitch" and that Weller should report her to his superiors if she caused any problems. Martinez was the only woman on Weller's shift at LFD. Weller contends that, immediately upon starting at LFD, he realized that his PSI coworkers' sole problem with Martinez was that she was a woman in a fire department.

Weller alleges that he heard Deputy Chief Ray White ("White") refer to Martinez as a "whiny bitch." White also made routine jokes in front of Martinez, referencing "BBC," a pornographic abbreviation for "big black cock." Weller asserts that he heard Lieutenant Cesar Canchola regularly refer to Martinez as "the bitch," Lieutenant Jeff Szczech ("Szczech") call her "useless," and Battalion Chief James Barnett ("Barnett") "brazenly" talk to Martinez about her breasts. Weller characterizes such harassment of Martinez as "widespread behavior that was effectively sanctioned by the company."

Before she began working for PSI at LFD, Weller alleges that Martinez was interviewed by LFD Chief Michael Hansen ("Hansen"), who told Martinez that he feared she would cause sexual tension and eventually have a sexual relationship with a coworker. Hansen told Martinez not to try to seduce anyone at work. On Martinez' first day at LFD, Battalion Chief John Jaeger asked her if she was sleeping with her then-Lieutenant, a rumor that firefighters Keith Dawson ("Dawson") and Joe Jarzembowski ("Jarzembowski") later admitted to have started.

Weller "made it clear" to his coworkers and supervisors that their behavior was unacceptable. In response to Weller's efforts to treat Martinez with respect, Barnett described Weller as "Chloe with a penis," and Dawson referred to Weller as Martinez' guard dog. PSI leadership and employees also spread "entirely false rumors alleging that Weller was having a sexual affair with [Martinez]…." This despite Weller's coworkers' knowledge that this was untrue and that Weller remained engaged to a

woman he publicly calls his wife. Weller also alleges that he was subjected to comments along the lines of whether he had impregnated Martinez, requests to bring in videos of he and Martinez having sex, and, in violation of a supposed on-duty cell phone policy, pornographic images texted to Weller with questions about whether they depicted the type of sexual activity he and Martinez engaged in.

Weller alleges that supervisors were aware of the ongoing misbehavior and "join[ed] in on harassing and retaliating against" him. On or around May 12, 2016, Barnett told Weller that White claimed that Martinez and Weller had sex in the parking lot that night. Three days later, White repeated the "blatantly false statement" to Graham.

Weller contends that the lies about his relationship with Martinez became so widespread that Weller's fiancée heard of them, leading to problems in their relationship and "severe emotional harm to [Weller]." In May 2016, Weller emailed Hansen directly to address the retaliation and harassment he was enduring. Weller alleges that someone from PSI then went into Weller's email account to delete the email. Brian Holman ("Holman"), PSI's legal counsel, has admitted to Weller that he has seen the email.

Weller followed up with Hansen in-person the same week, and Hansen assured him that the matter would be addressed at an officers' meeting. Such a meeting never happened, and the behavior at LFD worsened. Shortly after speaking with Hansen, Weller's co-worker, Chris Ritzler ("Ritzler"), pushed Weller's bed next to Martinez',

covering both beds with a single blanket. Weller reported the incident to Graham, his supervisor at the time, but Graham refused to investigate or address the incident. Later on, Ritzler admitted to his actions but faced no discipline.

In June 2016, Weller called into LFD and told Dawson that he would not be coming in the next morning. Dawson then turned to Martinez, in front of their coworkers, and said, "Your boyfriend just called off. What are your plans tomorrow Chloe?" The next month, on or around July 11, 2016, Weller told Barnett that Martinez would be coming in that night to pick up some equipment, to which Barnett replied, "Ask her if she wants to have a threesome."

### b. Lieutenant Jeff Szczech's Drug Abuse

Almost immediately upon starting at LFD, Weller heard rumors of Szczech's "well-known abuse of prescription narcotics." Barnett told Weller that Szczech had been using pain pills for years due to a back injury and that Barnett periodically had to wake Szczech up while on duty, "including while out on calls." Weller also heard about Szczech's drug problem from Martinez and Battalion Chief Jim Aageson ("Aageson"). Szczech was out on disability leave from back surgery when Weller began at LFD, but his drug problems became evident upon his return to duty.

Weller states that he and his colleagues, who are trained to recognize individuals under the influence of narcotics, routinely saw that Szczech was unfit for duty. Szczech often slept at his desk and moved too slowly for the demands of the job. In one instance, Weller and Aageson timed Szczech taking over five minute to

get dressed in firefighting equipment; the process is expected to take ninety seconds or less. Weller also alleges that Barnett walked by the bay floor and commented to Weller and others multiple times that "he had monitored Szczech's NORCO (hydrocodone bitartrate and acetaminophen) supply and seen that Szczech was taking more than one should while on duty." Barnett explained that monitoring Szczech's abuse was the only way to keep Weller and the rest of the shift safe.

With Szczech still allowed to serve "as a primary patient caregiver, the leading company officer on Engine 15, and co-pilot the Tower," Weller and others expressed to Barnett their fears about the risk of Szczech's drug abuse to them and the public. Barnett replied that the issue had been reported to Hansen and White multiple times with no result. Barnett instructed Weller and his coworkers to take photographs and/or video to document Szczech's problems.

On or around March 12, 2016, Weller saw Szczech taking medication. Weller was scheduled to work with Szczech on the engine, but he was concerned about his personal safety as well as that of the public. He approached Barnett with his concerns, who reiterated that PSI would not take action without proof. Throughout the day, Szczech was lethargic, slurred his words, and periodically dozed off while on duty.

On or around April 6, 2016, Engine 15 went to the Northeastern Illinois Public Safety Training Academy ("NIPSTA") for a training drill. The lead NIPSTA instructor expressed concerns about Szczech's behavior, noting that he nodded off

during training and was unable to stand after drills. Weller texted Barnett about this incident, who responded to Weller that he was in Hansen's office and claimed to have shown Hansen the text. PSI ultimately did nothing about the incident.

On or around July 11, 2016, Szczech was responsible for driving the reserve ambulance, which received a call to attend to a seven-year-old girl. While Szczech was initiating care, Weller saw him begin to nod off. Weller also observed Szczech get into the driver's seat to drive the girl to the hospital. That night, Weller noticed that Szczech left out two pill bottles with his name on them, one each for Norco 10-325 and Xanax. Weller took photos of the bottles and sent them to Dawson, the EMS Coordinator. Dawson did not respond.

Weller alleges that it is against Illinois public policy for a public safety officer to abuse narcotics while on duty. Weller also notes that it is a crime in Illinois to drive while under the influence of drugs.

### c. Weller's Termination & PSI Retaliation

On July 14, 2016,[1] less than a month after Weller's final complaint about the harassment and retaliation that he was subject to for standing up for Martinez, and just three days after giving PSI proof of Szczech's drug problem, PSI terminated Weller's employment. Hansen and White informed Weller that he was being terminated for violating both a cell phone policy and the Health Insurance Portability and Accountability Act ("HIPAA").

---

[1] The Amended Complaint lists this date as July 14, *2017*. This appears to be a typo, as all of the events that Weller describes as having occurred around the time of his firing carry dates of 2016.

The cell phone policy violation was explained to Weller as having arisen from his taking pictures of Szczech's medicine. Weller alleges that "every single person on [his] shift, both peers and superior officers, routinely used their cell phones for all sorts of activities…and none of them were ever even reprimanded, let alone punished."

Weller was also told that his photographs of Szczech's medicine were the basis for his HIPAA violation, "a demonstrably false claim given that HIPAA does not apply to [Weller] vis-á-vis [Szczech], and even if it did, there is a clear exemption to HIPAA for whistleblowing." Weller alleges that he "believed in good faith that Szczech's behavior violated professional and clinical standards…endangered patients, coworkers and the public and he disclosed his beliefs to the proper authorities." Weller insists that PSI terminated him for defending Martinez and refusing to turn a blind eye to Szczech's drug problems. As Weller attempted to explain to Hansen and White that he only took pictures per Barnett's instruction regarding Szczech's drug abuse, he was told to leave the firehouse immediately.

In August 2016, Weller returned to PSI at their request to be interviewed by Holman regarding an internal investigation of harassment allegations made by Martinez. Weller told Holman "details of the discrimination and retaliation he endured regarding [Martinez]." Holman acknowledged to Weller that he had read the email that Weller sent to Hansen detailing the retaliation that Weller was enduring at work. Weller alleges that his requests for a copy of that email have been ignored.

After Weller's employment ended, Dawson and Barnett spread knowingly false rumors that Weller was romantically involved with a Village police officer. Additional PSI employees spread other false rumors, such as one about video footage of Weller and Martinez engaging in sexual intercourse in the LFD parking lot. PSI has taken no disciplinary action against any employees for harassing or retaliating against Weller or Martinez.

### d. Additional Allegations Related to Weller's Defamation, Tortious Interference, & Intentional Infliction of Emotional Distress Claims

At some point in 2016, the Village launched an "investigation into false allegations against [Weller]." "[T]he Village claimed to have found that Weller engaged in misconduct." At no point during the investigation did the Village interview Weller or inform him that he was under investigation. The contract between the Village and PSI gave the Village the right to insist that any PSI employee assigned to the Village be removed from that assignment.

Weller first became aware of the "false accusation" on September 9, 2016. On that date, PSI claimed to Weller that the Village conducted an investigation and found Weller to have "made inappropriate comments to an unnamed police officer at the Village that were 'sexually harassing in nature.'" In December 2016, in response to a request for Weller's personnel file, Weller received a copy of a memo from the Village, dated August 30, 2016, that stated that Weller "had engaged in

unprofessional conduct and…the Village did not want Weller assigned to Lincolnwood."

Weller insists that at no point did he ever speak inappropriately to a Village police officer nor say or do anything that could reasonably be considered harassment. Weller also alleges that he could not have known about the "defamatory statements" made about him during the Village's investigation prior to September 9, 2016.

Weller asserts that, because the Village knew that Weller's employment was terminated more than a month prior to its sending the August 30 memo, the memo was created "for no legitimate reason whatsoever and was a willful and wanton attempt to malign [his] professional reputation and interfere with his [PSI] employment contract…." Weller also alleges that "any individuals who impugned [him] in regards to his professional or sexual conduct or accused him of committing a crime did so with malice and did so outside the scope of their duties in hopes of interfering with his contract." Weller states that, by categorizing him as a probationary employee, PSI terminated Weller without affording him the protections of the collective bargaining agreement.

Weller also alleges that, by fostering an environment of harassment, tacitly endorsing its employees' claims, routinely making inaccurate allegations about him, and by terminating his employment, PSI consciously disregarded the probability that its actions would cause Weller emotional distress. Weller states that, as a result of

PSI's actions, he suffered severe emotional distress, problems in his relationship with his fiancée, anxiety, and humiliation.

## PROCEDURAL BACKGROUND

On April 12, 2017, Weller filed a Charge of Discrimination with both the Equal Employment Opportunity Commission ("EEOC") and the Illinois Department of Human Rights ("IDHR"). On July 11, 2017, the EEOC issued a right-to-sue letter. On October 18, 2017, the IDHR dismissed Weller's claim and issued a right-to-sue letter, as well.

On August 30, 2017, Weller filed a six-count complaint against Defendants. On November 27, 2017, Weller filed the subject of this opinion, his nine-count Amended Complaint, which states the following causes of action: Count I, Gender Discrimination against PSI in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; Count II, Unlawful Retaliation against PSI in violation of Title VII; Count III, Gender Discrimination against PSI in violation of the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1-101 *et seq.*; Count IV, Unlawful Retaliation against PSI in violation of the IHRA; Count V, Defamation *Per Se* against Jane and John Does #1-10; Count VI, against PSI, a violation of the Illinois Whistleblower Act ("IWA"), 740 ILCS 174/1 *et seq.*; Count VII, Common Law

Retaliatory Discharge against PSI; Count VIII, Tortious Interference with a Contract against the Village and Jane and John Does #1-10; and Count IX, Intentional Infliction of Emotional Distress ("IIED") against PSI.

PSI seeks to dismiss all seven counts lodged against it (Counts I, II, III, IV, VI, VII, and IX), and the Village seeks to dismiss the only count pled against it, Count VIII.

## LEGAL STANDARD

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) "tests the sufficiency of the complaint, not the merits of the case." *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 878 (7th Cir. 2012). The allegations in the Amended Complaint must set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Weller need not provide detailed factual allegations, but he must provide enough factual support to raise his right to relief above a speculative level. *Bell Atlantic. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "In conducting our review, we must consider not only the complaint itself, but also…documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Phillips v. Prudential Ins. Co. of America*, 714 F.3d 1017, 1019—20 (7th Cir. 2013).

A claim must be facially plausible, meaning that the pleadings must "allow…the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The claim must be

described "in sufficient detail to give the defendant 'fair notice of what the…claim is and the grounds upon which it rests.'" *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to withstand a 12(b)(6) motion to dismiss. *Iqbal*, 556 U.S. at 678.

## DISCUSSION

### I. The Village: Count VIII, Tortious Interference with a Contract

The Village moves the Court to dismiss Count VIII, with prejudice, because the letter upon which the cause of action is based, the Village's August 30 memo, was generated after the July 14 termination of Weller's employment contract with PSI. Weller not only concedes this to be the case, but he also admits that any distinct tortious interference claim based upon his collective bargaining agreement is not yet ripe for adjudication. Therefore, Count VIII is improperly before the Court, and it is dismissed from the suit, in accord with the parties' synchronous read of the law.

Of note, the Village does not address in its motion either the collective bargaining agreement or its role in Weller's tortious interference claim. It is upon Weller's own concession that the Court has been made aware that any such cause of action is, as of yet, unripe. Weller insists, however, that it may well ripen following his union's grievance process. Without any suggestion to the contrary in the Village's

motion, we agree with Weller that a dismissal, with prejudice, is improper at this juncture. We therefore grant the Village's motion to dismiss Count VIII, but we order the dismissal to proceed without prejudice.

## II.   PSI

### A. Counts I & III: Gender Discrimination

Counts I and III allege violations of Title VII and the IHRA based on gender discrimination.[2] "A complaint alleging sex discrimination under Title VII 'need only aver that the employer instituted a (specified) adverse employment action against the plaintiff on the basis of [his] sex.'" *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 827 (7th Cir. 2014) (quoting *Tamayo*, 526 F.3d at 1084). "[The Supreme Court] has never indicated that the requirements for establishing a prima facie [discrimination] case…also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 511 (2002). "Title VII claims are not subject to a heightened pleading standard." *Carlson*, 758 F.3d at 827. "In these types of cases, the complaint merely needs to give

_____

[2] As the parties agree that the analytical frameworks for Title VII and IHRA claims are "essentially identical," we analyze the related claims – Counts I and III, and Counts II and IV – together. *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 879 n.39 (7th Cir. 2016).

the defendant sufficient notice to enable [it] to begin to investigate and prepare a defense." *Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1028 (7th Cir. 2013).

Weller alleges that PSI "expected its male employees to join in the culture of discriminating against [sic] harassing Chloe Martinez," and that when he refused, he was harassed, mocked, and eventually "terminated…for not conforming to the gender norms put in place by…PSI." In his opposition brief, Weller argues that Title VII clearly protects against this brand of discrimination, which he terms "sex stereotyping." PSI disputes this assertion, insisting that "sex stereotyping is not an independent cause of action for gender discrimination." PSI cites to Judge Sykes' recent dissent in *Hively v. Ivy Tech Community College of Indiana*, where she posited that, despite the Supreme Court's discussion of sex stereotyping as potential evidence of sex discrimination, "to prove her case, the plaintiff must always prove that 'the employer actually relied on her gender in making its decision.'" 853 F.3d 339, 342 (7th Cir. 2017) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989)).

In *Price Waterhouse*, the Supreme Court stated:

[W]e are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group, for in forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.

490 U.S. at 251 (internal citations and quotation marks omitted). Following suit, in the plurality opinion from which Judge Sykes dissented, the Seventh Circuit

interpreted the Court's decision thus, "*Price Waterhouse* held that the practice of gender stereotyping falls within Title VII's prohibition against sex discrimination, and *Oncale* clarified that it makes no difference if the sex of the harasser is (or is not) the same as the sex of the victim." *Hively*, 853 F.3d at 342; *see Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998) (holding that "sex discrimination consisting of same-sex sexual harassment is actionable under Title VII"). The Seventh Circuit reaffirmed its *Price Waterhouse* interpretation not two full months after the *Hively* decision, stating, "Following *Price Waterhouse*, this court and others have recognized a cause of action under Title VII when an adverse action is taken because of an employee's failure to conform to sex stereotypes." *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1048 (7th Cir. 2017). The court went on to cite five such instances where United States courts of appeals have found that sex stereotyping can ground a Title VII discrimination cause of action. *Id.*

Our reviewing court then reflected fondly upon the Sixth Circuit's decision in *Smith v. City of Salem*, 378 F.3d 566 (6th Cir. 2004), parroting its sister court's articulation of Title VII's perspective on sex stereotyping:

> If Title VII prohibits an employer from discriminating against a woman for dressing too masculine, then, the court reasoned, Title VII likewise prohibits an employer from discriminating against a man who dresses in a way that it perceives as too feminine. In both examples the discrimination would not occur but for the victim's sex, in violation of Title VII.

*Whitaker,* 858 F.3d at 1049. A similar sentiment was reflected just before the turn of the millennium when, in *Doe by Doe v. City of Belleville, Illinois*, the court stated that "a man who is harassed because his voice is soft, his physique is slight, his hair is long, or because in some other respect he exhibits his masculinity in a way that does not meet his coworkers' idea of how men are to appear and behave, is harassed 'because of' his sex." 119 F.3d 563, 581 (7th Cir. 1997), *vacated on other grounds by City of Belleville v. Doe by Doe*, 523 U.S. 1001 (1998). Based on decades of Supreme Court and Seventh Circuit jurisprudence, we are confident that a Title VII cause of action, one generated from allegations of sex stereotyping, is actionable in this district.

Here, we are presented with a pleading that paints a picture of a firehouse characterized by an aggressive bawdiness promoted exclusively by a collection of male actors. Weller alleges that he was the only man to abstain from the scurrilous commentary and activity of his male co-workers, going so far as to let them know that their hypermasculine behavior was unacceptable. His reward, according to the Amended Complaint, was to be called "Chloe with a penis," Martinez' guard dog, and Martinez' boyfriend – despite Weller's engagement to a different woman. The harassment is even alleged to have extended into physical pranking, when Weller's bed was pushed together with Martinez' and draped in a single blanket. Finally, Weller unequivocally pleads that his declination to conform to PSI's gender norms ultimately resulted in his employment being terminated.

Per the Seventh Circuit's inclusion of sex stereotyping under the Title VII umbrella of gender discrimination, this is enough for Weller to state an actionable claim that he suffered an adverse employment action on the basis of his sex. We stress, however, that the pleadings standard for such a claim is significantly more lenient than that which governs post-discovery showings of recoverable Title VII liability. *See Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016)*; McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Discovery has a way of injecting color into a complaint's otherwise monochromatic portrait. A more demanding legal standard, informed by a more diverse palette of occurrences, perspectives, and interpretations, may well dictate a different result. But this is the 12(b)(6) stage. Having reviewed the face of the Amended Complaint with due deference – and the lascivious, hostile nature of the firehouse portrayed therein – we find that Weller has sufficiently pled his gender discrimination causes of action. PSI's motion to dismiss is denied as to Counts I and III.

### B. Counts II & IV: Gender-Based Retaliation

Counts II and IV plead gender-based retaliation in violation of Title VII and the IHRA. "Pleading a retaliation claim under Title VII requires the plaintiff to 'allege that [he] engaged in statutorily protected activity and was subjected to an adverse employment action as a result.'" *Carlson*, 758 F.3d at 828 (quoting *Luevano*, 722 F.3d at 1029). "[T]he protected activity of an employee making a retaliation claim must have been 'a but-for cause of the alleged adverse action by the employer.'"

*Carlson*, 758 F.3d at 828 n.1 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)).  The but-for requirement "does not mean that the protected activity must have been the only cause of the adverse action."  *Carlson*, 758 F.3d at 828 n.1. "Rather, it means that the adverse action would not have happened without the activity."  *Id.*

Here, the statutorily protected activities that Weller identifies in his opposition brief are "his objections to the discrimination faced by Ms. Martinez" that he brought to the attention of "multiple supervisors on multiple occasions."  PSI contends that these complaints did not rise to the level of protected activity because they failed to indicate that Weller "felt mistreated because of *his* protected class – gender" (emphasis added).  However, according to the standard iterated by the Supreme Court, as well as the legion of on-point Seventh Circuit inquiries, PSI has too narrowly constrained the statutory requirement.  It is not that Weller needed to have complained about *his* gender-based mistreatment, but that he "opposed *any* practice made an unlawful employment practice by" Title VII.   42 U.S.C. § 2000e-3(a) (emphasis added).

In *Crawford v. Metropolitan Government of Nashville and Davidson County, Tennessee*, the Supreme Court stated that "[w]hen an employee communicates to [his] employer a belief that the employer has engaged in a form of employment discrimination, that communication virtually always constitutes the employee's *opposition* to the activity."  555 U.S. 271, 276 (2009) (internal citation and quotation

marks omitted). The Seventh Circuit's caselaw echoes the *Crawford* reading of the Title VII requirement. *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) (to constitute a protected activity, a complaint to an employer "must indicate the discrimination occurred because of sex, race, national origin, or some other protected class"); *Hamm v. Weyauwega Milk Prods., Inc.*, 332 F.3d 1058, 1066 (7th Cir. 2003) ("Title VII protects an employee from 'retaliation for complaining about the types of discrimination it prohibits'") (quoting *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1007 (7th Cir. 2000)), *overruled on other grounds by Hively*, 583 F.3d 339; *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1147 (7th Cir. 1997) ("In order to demonstrate a case of retaliatory discharge, a plaintiff must show that [he] opposed conduct prohibited by Title VII…"). PSI even concedes that, in making his complaints, Weller "did not have to use the specific words 'gender discrimination.'"

Turning to the Amended Complaint, Weller alleged numerous instances of his lodging complaints to supervisors and objecting to his co-workers about their "mistreatment of Martinez" and "harassment of…Martinez." He then explicitly alleged that, after expressing his concerns to PSI's management about the "sex discrimination and harassment" of Martinez, he was retaliated against via an expansion of the harassment against him and his eventual termination. This constitutes an objection to the statutorily protected gender discrimination of Martinez that resulted in an adverse action against Weller. At the 12(b)(6) stage, that is all that

is required for Weller to state a Title VII retaliation claim.  PSI's motion to dismiss Counts II and IV is denied.

### C. Count VI: Illinois Whistleblower Act

Section 15 of the IWA provides:

> An employer may not retaliate against an employee for disclosing information to government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation.

740 ILCS 174/15(b).  PSI does not set forth any argument as to whether Weller's complaints properly contemplated illegal activity.  Rather, PSI insists that Weller "fail[ed] to allege that he made any complaint to a government or law enforcement agency."  In *Riedlinger v. Hudson Respiratory Care, Inc.* – the only authority to which PSI cites in support of its contention – a Northern District court, citing to two previous district court interpretations, construed the IWA as follows:

> [T]his court interprets Illinois law to provide that an employee has a cause of action for retaliatory discharge in Illinois only if he or she has revealed information…to some government or law enforcement agency. Where an employee has revealed this information *only to his or her employer*, there is no cause of action in Illinois for retaliatory discharge.

478 F.Supp.2d 1051, 1055 (N.D. Ill. 2007) (emphasis added).  Weller does not dispute *Riedlinger's* construction of the IWA, but he maintains that "it is commonly understood that a fire department is, in fact, a government agency."  Weller offers this "common understanding" without citation to any authority.

Weller does, however, note that the LFD was established by Chapter 4, Article 5 of the Municipal Code of Lincolnwood ("Code"). Although Weller did not attach the Code to his Amended Complaint, and neither party attaches it to their briefs, as a publicly available document, we may take judicial notice of the Code without converting PSI's 12(b)(6) motion to a request for summary judgment. *Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994). Indeed, Weller's cited provision of the Code establishes the LFD as a "principal department of the Village." Lincolnwood, Ill., Mun. Code ch. 4, art. 5-1 (2018). The Code also establishes the fire chief and lays out his duties, the majority of which entail marshaling the manpower of the LFD to keep the Village and its citizens safe from fires. Lincolnwood, Ill., Mun. Code ch. 4, art. 5-1 (2018).

In Illinois, "to qualify as a governmental entity, an entity must perform a governmental function." *Barry v. Ret. Bd. of Firemen's Annuity & Benefit Fund of Chi.*, 357 Ill.App.3d 749, 779 (2005), *abrogated on other grounds by Kouzoukas v. Ret. Bd. of Policemen's Annuity & Benefit Fund of City of Chi.*, 234 Ill.2d 446 (2009). Adopting Black's Law Dictionary's definition as its own, the state defines a "governmental function" as "[a] government agency's conduct that is expressly or impliedly mandated or authorized by constitution, statute, or other law and that is *carried out for the benefit of the general public*." *Barry*, 357 Ill.App.3d at 779.

When LFD carries out its prescribed responsibility of keeping the Lincolnwood citizenry safe from fires, it does so for the general public's benefit. Construing the

22

allegations of the Amended Complaint as true, Weller complained to LFD Chief Hansen of Lieutenant Szczech's illegal conduct. Under Illinois law, this manifested a disclosure not only to his employer, but also to a governmental agency of the Village. Weller alleged that he was terminated in retaliation for his disclosure, and at the 12(b)(6) stage, no more is required of him to state an IWA cause of action. PSI's motion to dismiss Count VI is denied.

### D. Count VII: Common Law Retaliatory Discharge

In Illinois, "[t]o establish a cause of action for retaliatory discharge, a claimant must show: (1) he was discharged in retaliation for his activities; and (2) the discharge violated a clearly mandated public policy." *Chi. Commons Ass'n v. Hancock*, 346 Ill.App.3d 326, 328 (2004). Here, Weller pled that in response to his complaints to PSI supervisors concerning Szczech's drug problems, "PSI subjected Mr. Weller to a pattern of harassment leading up to and including termination in retaliation for reporting his concerns." This language alleges the termination necessary to satisfy the first prong of the retaliatory discharge test, as well as its retaliatory connection to a violation of clear public policy. *See Jacobson v. Knepper & Moga, P.C.*, 185 Ill.2d 372, 376 (1998) (retaliatory discharge actions are viable "when an employee is discharged in retaliation for the reporting of illegal or improper conduct, otherwise known as 'whistle blowing'").

Devoting but a single paragraph of argument to the issue, PSI contends that because Weller seeks to recover for a "pattern of harassment," and Illinois does not

recognize such a claim, Count VII necessarily requires dismissal. *See Veit v. Vill. of Round Lake*, 167 Ill.App.3d 350, 353 (1988) ("…no basis exists upon which to expand the limited tort of retaliatory discharge to the concept of retaliatory harassment…"). This is a flagrant red herring. Indeed, PSI's own cited authority, *Veit*, was only presented with the retaliatory harassment question *because* the plaintiff there had "neither been discharged nor [had] the 'harassment'…been such as to cause plaintiff's resignation, or constructive discharge." *Id*. Weller states plainly that he was discharged as a result of his bringing the illegal activity of a co-worker to the attention of his employer. That he termed his discharge a form of "harassment" does not magically strip it of its legal meaning. Weller states a viable claim of common law retaliatory discharge, and PSI's motion to dismiss Count VII is denied.

### E. Count IX: Intentional Infliction of Emotional Distress

PSI argues that Weller's IIED claim should be dismissed for three distinct reasons: (1) the claim is preempted by the IHRA; (2) PSI cannot be held vicariously liable for the allegations Weller lodges against individual employees; and (3) Weller failed to allege facts sufficient to state a claim under Illinois' test for IIED viability.

Because PSI's respondeat superior concern settles the matter for present purposes, we devote the bulk of our attention to the question of vicarious liability.

In Illinois, "[f]or conduct to be within the scope of employment it must: (1) be of the kind the employee is employed to perform; (2) occur substantially within the authorized time and space limits; and (3) be performed, at least in part, by a purpose to serve the master." *Boston v. U.S. Steel Corp.*, 816 F.3d 455, 467 (7th Cir. 2016). "Where the motive for the employee's tort is personal and solely for the benefit of the employee, the employer is not subject to liability." *Id.*

In his allegations unique to Count IX, Weller states that PSI disregarded the probability that its action would cause Weller emotional distress. Those "actions" include "fostering an environment in which coworkers were free to harass and publicly attack Mr. Weller, tacitly endorsing their claims, and…routinely making inaccurate allegations about [sic] Dr. Pennington[3]…." In an effort to lasso PSI as an entity under the IIED umbrella, Weller crafts his pleading language in terms of the environment that PSI let flourish at LFD alongside PSI's tacit endorsement of Weller's coworkers' rumor spreading. Crafty though his IIED phrasing may be, the true nature of his allegations are not that PSI itself harassed, humiliated, gossiped, or pranked him, but that PSI's employees systematically carried out such emotionally distressing acts.

---

[3] The name "Dr. Pennington" appears nowhere else in the Amended Complaint. Nor does it appear a single time in the parties' briefs. The Court is confident that this was a drafting error, perhaps the remnant of a template complaint, and that "Dr. Pennington" is, in fact, "Mr. Weller."

Indeed, the remedial nature of tort claims anticipates the scenario Weller finds himself in, where an injured generally "must seek his or her remedy from the person who caused the injury." *Bagent v. Blessing Care Corp.*, 224 Ill.2d 154, 163 (2007). Weller details a laundry list of misconduct that individuals at LFD perpetrated against him. But the transgressing agents were just that, individuals under PSI's employ, not PSI itself. To be sure, an "employer's vicarious liability extends to the negligent, willful, malicious, or even criminal acts of its employees when such acts are committed within the scope of the employment." *Id.* at 163—64. On the face of the Amended Complaint, however, not a one of the acts was done in furtherance of PSI's function; they were all carried out for the exclusive purpose of gratifying the individual perpetrators in a manner readily distinguishable from any sort of business aim. Weller's remedy, if it exists, is against those persons, not their employer. Because PSI cannot be held vicariously liable for torts committed by its employees beyond the scope of their employment, its motion as to Weller's IIED claim is granted, and Count IX is dismissed.

*         *         *

In the event of the Court's dismissal of Count IX for reasons of respondeat superior, Weller requests "leave to amend his complaint to name the individuals responsible for the intentional infliction of emotional distress." The Court is prepared to grant his request, but we would offer a note on the viability of such an amendment before we do. To successfully assert an IIED claim requires the clearing of "the high

bar set by Illinois case law for that type of claim." *Richards v. U.S. Steel*, 869 F.3d 557, 566 (7th Cir. 2017). "[T]o qualify as outrageous, the nature of the defendant's conduct must be so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized society." *Feltmeier v. Feltmeier*, 207 Ill.2d 263, 273 (2003). "'Mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities' do not amount to extreme and outrageous conduct, nor does conduct 'characterized by malice or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.'" *Van Stan v. Fancy Colours & Co.*, 125 F.3d 563, 567 (7th Cir. 1997) (quoting *Public Fin. Corp.*, 66 Ill.2d 85, 89—90 (1976)).

Because PSI cannot be held vicariously liable on the facts alleged, the Court has no occasion to analyze the conduct of as-yet unnamed defendants. However, we note that the misbehavior that Weller identifies, viewed under an IIED lens, may well fit snugly under the "insults and indignities" notion explicitly proscribed by Illinois courts. While we grant Weller leave to amend consistent with his request, the Court is skeptical that any of the individual bouts of misconduct ascribed to named actors in his pleadings would qualify for IIED liability. Nonetheless, Weller's request is granted, and he is free to amend his complaint should he deem it wise.

## CONCLUSION

For the aforementioned reasons, the Court grants the Village's request to dismiss Count VIII, but we order the dismissal to proceed without prejudice. We

deny PSI's motion as to Counts I, II, III, IV, VI, and VII.  We grant PSI's motion to dismiss Count IX, without prejudice, as well as Weller's request to amend his complaint in keeping with Count IX's dismissal.  It is so ordered.


Dated: 3/14/2018

_____
Charles P. Kocoras
United States District Judge